COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Coleman and Lemons[*]
Argued at Richmond, Virginia


MAURICE DANIEL DANCE
                                            OPINION BY
v.    Record No. 0434-99-2        JUDGE SAM W. COLEMAN III
                                            MAY 16, 2000
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF HALIFAX COUNTY
               Charles L. McCormick, III, Judge

          Buddy A. Ward, Public Defender (Office of the
          Public Defender, on brief), for appellant.

          Virginia B. Theisen, Assistant Attorney
          General (Mark L. Earley, Attorney General, on
          brief), for appellee.


     Maurice Daniel Dance was convicted in a bench trial of

threatening to bomb a building in violation of Code § 18.2-83.

Dance argues that the trial court erred by denying his motion to

suppress evidence of the out-of-court identification of his

tape-recorded voice and by denying his motion to strike the

testimony of J.J. Daniel.  He also argues that the evidence is

insufficient to support his conviction.  We disagree and affirm

the conviction.

---

          [*] Justice Lemons participated in the hearing and decision of
this case prior to his investiture as a Justice of the Supreme
Court of Virginia.

BACKGROUND

Leslie Lavell, an employee of the Dollar General Corporation, was working at the company's warehouse when she received a threatening telephone call. She testified that the caller stated that there was a bomb in the building and hung up. Lavell dialed "star 57" to activate a caller tracing device. Lavell spoke to the police within thirty minutes of receiving the threatening call. She informed them that, based upon the caller's accent, she believed the caller was an African-American male.

Shortly after the incident, Special Agent Larry Bishop played an audio cassette for Lavell which had recorded the voice of an individual who had made a bomb threat at another location. The recording was of Dance's voice. Lavell, however, was unable to identify that individual's voice as the person who made the threatening call to her earlier that evening.

After learning the location from where the call had reportedly been made, Trooper M.S. Roark went there and questioned three of the four people at the residence: Terry Lee Scott, Tarra Hendren, and Dance. Terry Lee Scott's sister, who lived next door, accompanied Trooper Roark inside the residence, but she was not questioned. The trooper recorded the conversation and within approximately an hour and one-half after the bomb threat, he played the recording for Lavell. The trooper told Lavell that the recording had been made of the voices of the people from where the

bomb threat had been placed. Lavell quickly discounted Hendren's, a woman's voice, and Scott's, an individual whom she knew personally and who had a speech impediment. Lavell continued listening to the recording and, when Dance raised his voice in response to an accusation from a police officer that he had made the threatening call, Lavell identified him as the caller. She reiterated at trial that she was "a hundred percent sure" the voice was the same voice as the person who made the threatening call and that she recognized it when Dance raised his voice.

J.J. Daniel, manager of Sprint's Annoyance Call Center for the mid-Atlantic region, testified that after a customer receives an annoying or harassing telephone call, the customer is able to call the center and report the date and time of the call and the telephone line on which the call was received. A customer is able to originate a trace by hanging up, obtaining a new dial tone, and then dialing "star 57." Once the call trace mechanism is activated, a computer located at Sprint's central office "seizes," indexes, and stores the information until retrieval. Daniel testified that she helped design the system and train the staff to retrieve and secure the information. The system has been operational since 1989 and has retrieved more than 100,000 calls per year. Daniel testified that the system has never misidentified a call.

Daniel testified that on this occasion the call trace mechanism had been activated from the telephone at the Dollar General Store. A trace of the last call received at the store revealed the phone number from where the call had been placed and with that information, the center determined the address from where the call was placed. The center then informed the police of the address, which was Hendren's residence.

Prior to trial, Dance filed a motion to suppress Lavell's identification of his voice from the audio recording. The trial court denied the motion.

## ANALYSIS

### A. Motion to Suppress

Dance argues that the trial court erred in failing to suppress evidence of Lavell's identification of his voice on the recording because the voice identification procedure was unduly suggestive. He also argues that Lavell's identification was unreliable.

We have not expressly addressed the factors to be considered in reviewing the admissibility of a witness' voice identification of a suspect. The Commonwealth and Dance maintain that the situation is analogous to a photographic lineup and, in particular, a show-up. We agree. Accordingly, we hold that the constitutional safeguards that apply to visual identification also apply to voice identification. See generally State v. Gallagher,

668 A.2d 55, 62-63 (N.J. Super. Ct. App. Div. 1995); Jefferson v.

State, 425 S.E.2d 915, 918 (Ga. Ct. App. 1992); State v. Parker,

558 N.E.2d 1164, 1169 (Ohio 1990); Vouras v. State, 452 A.2d 1165,

1167-69 (Del. 1982).

"An out-of-court identification is admissible if either

(1) the identification was not unduly suggestive; or (2) the

procedure was unduly suggestive, but the identification was so

reliable that there is no substantial likelihood of

misidentification."  Charity v. Commonwealth, 24 Va. App. 258,

261, 482 S.E.2d 59, 60 (1997).  Show-up identifications are not

per se violative of constitutional rights, see Smith v. Thompson,

1 Va. App. 407, 411, 339 S.E.2d 556, 558 (1986), and such

identifications will not be declared invalid unless a review of

the totality of the circumstances shows a substantial likelihood

of misidentification.  See Manson v. Brathwaite, 432 U.S. 98, 116

(1977); Delong v. Commonwealth, 234 Va. 357, 366, 362 S.E.2d 669,

674 (1987).

The United States Supreme Court in Neil v. Biggers, 409 U.S.

188 (1972), articulated five factors to consider in determining

reliability of an out-of-court visual identification.  By analogy,

to determine whether a voice identification is admissible, the

court must consider:  (1) the witness' opportunity to hear the

accused at the time of the crime; (2) the witness' degree of

attention; (3) the accuracy of the witness' prior description of

- 5 -

the suspect's voice; (4) the level of certainty demonstrated by the witness at the time of the voice identification; and (5) the length of time between the crime and the identification.  See id. at 199-200.

Here, upon arriving at the Dollar General warehouse, the police presented Lavell with a tape recording of an unrelated bomb threat.  The officer told Lavell that the recording was the voice of a caller who recently had make a bomb threat to a similar business in the area.  Although the voice was that of Dance, Lavell was unable to identify Dance's voice as the person who had called her.

Upon learning of the location from where the call was placed, the police proceeded to the location and interrogated the occupants, informing them that the police already knew the call came from the residence.  When the police accused Dance of making the call, Dance raised his voice and accused the police of harassing him.  The police recorded their conversation with the occupants.  When Lavell was presented with this audio recording, the police told her it came from the occupants of the residence from which the threatening call had been placed.  Lavell immediately excluded Hendren and Scott as the caller.  When Dance raised his voice in response to police accusations that he may have made the call, Lavell identified him as the caller.  She

explained that she recognized his voice when he raised it and that she was "a hundred percent sure" that Dance was the caller.

We consider the audio recording of Dance's voice during the police interrogation at Hendren's residence to be tantamount to a show-up. Hendren's and Scott's voices were immediately excludable, leaving only Dance's voice as the one for Lavell to consider. Additionally, we find that the identification procedure was unduly suggestive. Lavell was told by the officer that the recorded conversation took place at the residence from where the call reportedly originated and that one of the voices was probably that of the caller. However, after viewing the totality of the circumstances, we conclude that Lavell's identification of Dance was reliable and without any substantial likelihood of misidentification due to the certainty expressed by Lavell in her identification and her explanation for that certainty.

Lavell testified that she clearly heard the caller's voice. She also was able to recall his words in their entirety. See United States v. Patton, 721 F.2d 159, 162 (6th Cir. 1983) (noting that the fact that witness could repeat the threats demonstrated a high level of concentration). Before hearing either of the recordings, Lavell identified the caller as an African-American male. Moreover, less than two hours elapsed between the time Lavell received the threatening phone call and when she identified Dance's voice on the audio recording. Although Lavell had been

- 7 -

unable to identify Dance's voice on the first recording played for her, she explained that after hearing Dance's raised voice, she was certain in her identification. Lavell also testified that the police did not suggest to her that she should identify one of the voices as the caller. We find that the voice identification procedure was unduly suggestive because the officer told Lavell that the recording came from the residence where the threatening call had originated and one of the voices on the recording was probably the caller. Nevertheless, based on the totality of the circumstances, particularly Lavell's certainty expressed in the identification and her explanation for recognizing Dance's voice, we find no substantial likelihood of misidentification in Lavell's identification of Dance's voice. Accordingly, the trial court did not err by denying Dance's motion to suppress.

## B. Admission of Testimony

Dance argues that the trial court erred by admitting Daniel's testimony regarding the computerized call tracking system. Dance, relying on Penny v. Commonwealth, 6 Va. App. 494, 370 S.E.2d 314 (1988), argues that Daniel's testimony regarding the general features and the function of the "star 57" device is inadmissible because the Commonwealth failed to establish the system's accuracy.

In Penny, the Commonwealth sought to introduce the evidence of a computer-generated "call trap" record which designated the

defendant's residence as the originating source of obscene phone calls made to the victim. A "call trap" is an electronic device which repairmen program into the telephone company's computer that enables the computer to automatically receive and print information concerning calls to the particular number on which the trap was placed. At trial, the Commonwealth introduced no evidence that the particular trap placed on the victim's phone was tested for accuracy. Moreover, the defendant introduced evidence that the voltage on the defendant's telephone line was abnormal and that the abnormality could cause calls to be traced to that number even when the call did not originate from that number. We held that computer generated call trap identification is the result of technological or scientific procedures and, therefore, the results may be admitted only after the particular device is proven reliable. See id. at 498-99, 370 S.E.2d at 316-17.

We find that Daniel's testimony was sufficient to establish the reliability of the computer operated "call trace" system. Daniel testified that she helped design the system and train people in its use. She explained that the system does nothing more than retrieve a particular call that has been identified and display the telephone number from where the call originated, thus, allowing the company to identify the location from where the call was placed. Although Daniel did not explain the technology involved, she explained how the procedure worked and testified

- 9 -

that in her experience in handling more than 100,000 telephone calls since 1989, the system had never misidentified a call. Accordingly, we find that the trial court did not err in allowing the Commonwealth's witness to testify and to identify the number that was retrieved from the company's annoyance call center.

## C. Sufficiency

On review, we view the evidence in the light most favorable to the prevailing party and grant to it all reasonable inferences fairly deducible therefrom. See Commonwealth v. Jenkins, 255 Va. 516, 521, 499 S.E.2d 263, 265 (1998). "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995) (citations omitted). "The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict, and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Beck v. Commonwealth, 2 Va. App. 170, 172, 342 S.E.2d 642, 643 (1986).

Dance argues that in light of the unreliable voice identification and the inadmissible testimony regarding the call tracing device, the evidence is insufficient to support the conviction. We have addressed and rejected Dance's contentions that the voice identification was unreliable and that the evidence

- 10 -

of the call tracing device was inadmissible.  Thus, the evidence,
viewed in the light most favorable to the Commonwealth, proved
that the telephone call was traced to a location to which Dance
had access and proved Dance was present less than two hours after
the call when the police arrived to investigate.  Further, Lavell
positively identified Dance's voice as that of the caller.  The
trial court found Lavell's testimony credible and her
identification reliable.  Thus we find the evidence is sufficient
to support the conviction.

Accordingly, we affirm the conviction.

Affirmed.

Benton, J., dissenting.

For the reasons stated in the majority opinion, I agree that the voice identification procedure was unduly suggestive; however, I disagree with the majority's finding that the identification nonetheless was reliable.

"Suggestive confrontations are disapproved because they increase the likelihood of misidentification." Neil v. Biggers, 409 U.S. 188, 198 (1972).

> The constitutional safeguards that apply to visual identifications also apply to voice identifications. [Thus, a] "voice identification is inadmissible if its reliability is outweighed by the suggestiveness of the identification procedure." "Reliability depends on such factors as the witness's opportunity to hear the accused and the consistency with prior voice identifications." In other words, the witness must have an adequate basis for comparing defendant's voice with the voice he or she identified as the voice of the assailant.

State v. Gallagher, 668 A.2d 55, 62-63 (N.J. Super. Ct. App. Div. 1995) (citations omitted); see also United States v. Schultz, 698 F.2d 365 (8th Cir. 1983). "It is the likelihood of misidentification which violates a defendant's right to due process." Biggers, 409 U.S. at 198. Thus, a voice identification is inadmissible when the evidence establishes a substantial likelihood of misidentification. See id.

The record establishes a substantial likelihood of misidentification by Leslie Lavell. The record fails to prove

- 12 -

that Lavell had the opportunity to give a significant degree of attention to the voice she heard on the telephone. See id. at 199 (stating that one of the factors to be considered in evaluating the likelihood of misidentification is the "witness' degree of attention"). She received only one telephone call from the person who made the threat and did not specifically indicate the length of the call. Lavell's description of the words spoken suggests, however, that the call was very brief. She testified that "the person on the phone said, it's a bomb in the MF building and then hung up." Although Lavell reported to the police that the caller was an African-American male, she did not otherwise describe the caller. She did not say whether the voice was low or high pitched, deliberate, excited, or otherwise distinctive.

In addition to the brevity of the call, the other evidence also detracts from Lavell's claim of certainty of identification. See id. (stating that another factor is "the level of certainty demonstrated by the witness at the confrontation"). Within a half-hour after she received the call, a police officer asked Lavell to listen to a recording of a person's voice. She did, but could not recognize the voice. The evidence proved Dance's voice was on that recording. Thus, Lavell could not identify Dance's voice shortly after the call and within the same context of the call. Her failure to do so

undermines both her initial degree of attention and the level of certainty that she later claimed to have regarding the voice identification.

When the officer entered Tarra Hendren's residence, three people were then present -- Dance, a woman, and a man who stutters. While making an audio recording of their conversations, the officer confronted the three people and accused Dance of making the telephone call. When the officer took that recording to Lavell, she understood from the officer's comments that the recording concerned the bomb threat she had received. She also knew the recording had been made after she received the telephone call. As Lavell listened to the recording, she heard the officer make the accusation that someone from the house had called in a bomb threat to her. Clearly, the likelihood of "misidentification is . . . heightened if the police indicate to the witness that they have other evidence that one of the persons . . . committed the crime." Simmons v. United States, 390 U.S. 377, 383 (1968). Moreover, no evidence tends to prove that the time that elapsed between the telephone call to Lavell and the officer's arrival at Hendren's residence was so short that it was unlikely another person had left the residence before the officer arrived.

When the officer began "conversing" with Dance, the audio recording captured Dance's protest. Lavell testified that, when

she heard a man "raising his voice . . . [, saying] they were harassing him when they were trying to say that he did it," she identified that person as the caller.  Lavell did not testify, however, that the caller who made the bomb threat raised his voice.

> "The suggestive elements in this identification procedure made it all but inevitable that [Lavell] would identify [Dance] whether or not he was in fact "the man."  In effect, the police repeatedly said to [Lavell], "This is the man."  This procedure so undermined the reliability of the . . . identification as to violate due process."

Foster v. California, 394 U.S. 440, 443 (1969).

The totality of these circumstances does not support a finding of reliability.  The evidence fails to prove that Lavell had an adequate basis for making the comparison between the caller and Dance's voice.  One half-hour after the call, she could not identify Dance's voice as the caller.  Later, the police essentially told Lavell the second recording would have the voice of the caller.  The recording on which Lavell claims to have identified the caller contained voices of Dance, a woman and a man who stutters.  The voices of the woman and the man who stutters would have been distinctive and were not consistent with the voice of the caller, as initially described by Lavell.  In other words, it was "all but inevitable," id., that Lavell would eliminate the voices of the woman and the stuttering man

- 15 -

and identify the remaining voice as the caller. Indeed, Lavell testified that she could eliminate the voice of the stuttering man because she knew him.

In addition, the conclusion is unavoidable that, when Lavell heard Dance's voice on the first recording and could not identify that voice as the caller, the repetition of his voice on the second recording, after the suggestive representations, made it inevitable that she would then say Dance was the caller. The evidence leaves to speculation whether Lavell had the ability to discern that the second recording contained a voice familiar to her because it was indeed the caller or, rather, merely because it was the voice she heard on the first recording. The substantial likelihood of misidentification flowing from this circumstance alone is compounded by the officer's representation to her that the second recording was made at the house where the call originated and that one of the voices was that of the caller.

The explanation for the identification is inextricably linked to the suggestive representations the police made to Lavell. Those suggestive representations undermine the credibility of the identification and establish more than a substantial likelihood of misidentification. For these reasons, I would hold that the trial judge erred in refusing to suppress

the voice identification.  Accordingly, I would reverse the conviction and remand for a new trial.