# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

v.

Hylek S. Williams

May 16, 2016

Case Nos. (Criminal) CR16-412-00 to CR16-412-03

BY JUDGE DAVID W. LANNETTI

Today the Court rules on the motion filed by Defendant Hylek S. Williams seeking to suppress all out-of-court and in-court identifications by Eric McGinnis, of Williams, stemming from a show-up identification (the "Motion To Suppress"), as well as Williams's Motion for Funds for Eyewitness Expert (the "Motion for Funds"). The issues before the Court are as follows: (1) whether the show up of Williams was unnecessarily suggestive; (2) if suggestive, whether the show up was nevertheless reliable; and (3) whether Williams is entitled to funding from the Commonwealth to hire an eyewitness expert. The Court finds as follows: (1) the show up of Williams was unnecessarily suggestive; (2) the show up identification of Williams by McGinnis was not reliable; and (3) funding for an eyewitness expert is no longer necessary.

Based on the totality of the circumstances, the Court grants Williams's Motion To Suppress. Because granting the Motion To Suppress moots the need for an eyewitness expert, the Court denies the Motion for Funds.

*Background*

While McGinnis was taking out the trash from his residence to the street after dark on November 12, 2015, he was attacked by three young black males. (Preliminary Hearing ("PH") Tr. 4, 18-19.) McGinnis did not testify at the suppression hearing, nor did Detective Frenier or Officer Cogswell. The parties stipulated that the Court could consider the Preliminary Hearing transcript for purposes of ruling on the Motion To Suppress and Motion for Funds. (Suppression Hearing ("SH") Tr. 57.) McGinnis initially was hit from behind and then was pushed to the ground, landing face down. (*Id.* at 4.) When he fell, McGinnis testified he "was not looking at anybody," but instead "was trying to cover and hold up [his] arm." (*Id.* at 19.) The "lead" attacker kicked McGinnis, went through McGinnis's pockets, retrieved money and keys, and stole $12. (*Id.* at 4, 14.) McGinnis apparently initially reported to law enforcement that $300 had been stolen from him, although he subsequently found the "deposit from [his] store that was in the bank bag that was inside [his] car," which accounted for most of the "stolen" money. (Preliminary Hearing ("PH") Tr. 14.)

McGinnis turned over, which allowed him to see the lead attacker, who was approximately three feet away from him. (*Id.* at 21.) McGinnis testified that the attacker pointed a gun at him at close range, he "could not stop looking at [it]," it was a black semiautomatic, and he was "[c]oncerned" about his family. (*Id.* at 22, 26-27, 32.) McGinnis attempted to grab one of his attackers, whereupon one or more of the attackers started shooting toward him. (*Id.* at 4.) McGinnis testified that he stood up to avoid being shot and that the attackers continued to shoot "directly at [him]" and at his house, in which his girlfriend and five children were located. (*Id.* at 3, 36, 38.) McGinnis testified that three bullets "penetrated the outside of [his] house." (*Id.* at 36-37.) McGinnis was injured as a result of the attack; in addition to bruising, his head was "split open," possibly from a bullet grazing it. (*Id.* at 7-8.) At some point during or immediately after the attack, McGinnis's girlfriend called 911 to report the incident. (*Id.* at 25.)

The incident occurred at night, near a streetlight, in the vicinity of McGinnis's residence. (*Id.* at 20.) Detective Frenier, one of the detectives who responded to the 911 call testified that, shortly following the attack, McGinnis described the lead attacker, the "guy who was the one kicking him," as a "black male, about six feet tall, maybe 180 to 190 pounds, small dreadlocks and a red bandanna across his face . . . [w]earing tan pants, light shirt, . . . [and] a jacket of some sort . . . not like a sweater, thicker than a hoodie-type sweater." (*Id.* at 41, 50.) Detective Peirsol, who accompanied Detective Frenier, similarly testified that McGinnis reported his attacker was wearing "a white T-shirt and tan pants." (Suppression Hearing ("SH") Tr. 24.)

McGinnis testified that, after the attack but before the detectives arrived, he drank some wine and took a shot of alcohol. (*Id.* at 31.) The detectives

arrived at McGinnis's residence at 9:27 p.m. in response to the 911 call. (*Id.* at 41.) About twenty minutes later, the detectives were notified that other law enforcement officers had an individual in custody; McGinnis was administered a standard show-up admonishment by one of the detectives and taken to a second location, which was about five to ten miles away, where a one-on-one show up was conducted. (*Id.* at 42-43.) The second location was another crime scene, where Williams was the apparent victim of a separate alleged shooting. (*Id.* at 60; SH Tr. 20.) There were numerous patrol cars and at least eight other law enforcement officers present at the second crime scene. (PH Tr. 48; SH Tr. 20.) Williams was the only suspect shown to McGinnis. (PH Tr. 20.) McGinnis stood about 50 feet away from Williams,[1] who was removed from a law enforcement vehicle, in handcuffs,[2] and illuminated for the show up with high-beam headlights from the detectives' car and one or two flashlights pointed at Williams's face at close range by one of the detectives. (*Id.* at 20-21, 44; SH Tr. 45-46.) McGinnis immediately told one of the detectives, "Yeah, that's him," and later stated that he identified Williams at the show up based on Williams's "blank stare," which McGinnis described as "unforgettable." (PH Tr. 8, 11.) Williams testified that, under the lighting conditions, he "could not even tell you what the car looked like" during the show up. (SH Tr. 47.)

Williams is a young black male who is approximately 5'10" tall and had short, dark dreadlocks at the time of McGinnis's assault. (SH Tr. 48.) Detective Frenier testified that, at the show up conducted less than an hour after the assault,[3] Williams "was wearing a black hoodie . . . and jeans . . . [that] had . . . a faded wash look to the front of them." (PH Tr. 44-45.) According to Williams, he was wearing what he described as "wheat" colored Timberland boots, washed-out jeans, and a black hooded sweatshirt. (SH Tr. 50.) Williams's description of the clothing he was wearing at the time of the show up was not disputed. Williams was not wearing a bandanna, white T-shirt, or tan pants, and none of these was in his possession or found in the vicinity of the second crime scene. (PH Tr. 12; SH Tr. 29-30.)

---

[1] When McGinnis was asked by Williams's attorney whether the distance between him and Williams during the show up was twenty feet away, McGinnis responded, "A couple car lengths, yes, ma'am." Nevertheless, Detective Frenier, who obviously has more experience performing show ups, estimated the distance at 50 feet. (PH Tr. 21, 44, 51.)

[2] There is some dispute regarding whether Williams was wearing handcuffs during the show up. McGinnis recalled Williams wearing handcuffs, (PH Tr. 33), as did Officer Cogswell, who was present at the second crime scene where the show up took place, (*Id.* at 59), and Williams himself, (SH Tr. 45). Detective Frenier, on the other hand, testified that Williams was not handcuffed. (PH Tr. 44.)

[3] Based on testimony at the preliminary hearing, McGinnis had time after the assault for at least two drinks before the detectives arrived; the detectives were at McGinnis's house for approximately twenty minutes; and the detectives and McGinnis traveled five to ten miles to the second crime scene for the show up thereafter. (PH Tr. 31, 42-43.)

At the preliminary hearing, McGinnis described the lead attacker as between 5'10"and 5'11" tall, of light build, and 150 or 170 pounds, with very short black dreadlocks, wearing dark clothes, dark jean pants, a lightweight jacket, a black-and-white bandanna that "covered from the bridge of [his nose] down," a hat or hood, and boots, "like work boots" that were "a dark color . . . [b]rown, black" (PH Tr. 5-7, 10, 11, 23-24, 29.)

Williams was indicted for malicious wounding, use of a firearm in the commission of a felony, robbery with the use of a gun, and discharge of a firearm into an occupied dwelling. Williams subsequently filed the Motion To Suppress and Motion for Funds that are the subject of this letter opinion.

*Positions of the Parties*

A. *Williams's Position*

Williams moves to suppress all out-of-court and in-court identifications of him by McGinnis, alleging that the show-up identification violated his due process rights. In support of his motion, Williams points to certain facts, elicited at the preliminary hearing, indicating that McGinnis did not have sufficient opportunity to observe his attacker and that Williams did not match the description McGinnis provided to law enforcement. Specifically, Williams notes that McGinnis was struck and fell to the ground. (Mot. to Supp. 1.) McGinnis could not provide a description of his attackers' faces or describe any unique identifying features. (*Id.*) Although McGinnis was able to describe the clothing of his attackers generally and asserted that they were wearing bandannas that covered most of their faces, his descriptions have varied over time. (*Id.*)

Williams calls into question the reliability of the show-up identification, noting that "McGinnis had drunk a glass of wine and a shot" shortly before the show up took place. (*Id.* at 2.) Williams also points out that the show up was at "the scene of another crime where [Williams] was the victim of a shooting [and where] there were several police vehicles and police personnel present." (*Id.*) During the show up, "McGinnis stood approximately 50 feet from the alleged suspect with the illumination of car headlights and a flashlight upon [Williams's] face," and McGinnis stated that he identified Williams "by the 'blank stare' on his face." (*Id.*) Williams argues that these suggestive circumstances, combined with a lack of exigency and reliability, necessitate suppression of McGinnis's identification of Williams.

In his Memorandum in Support of his Motion To Suppress, Williams discusses in detail the alleged unreliability of eyewitness identifications, citing findings of the Innocence Project and multiple secondary sources. (Memo. Supp. Mot. Suppress 4-9.) Williams asserts that the detectives "followed virtually none of the recommended procedures" of the 2014 Virginia Department of Criminal Justice Services' *Model Policy on*

*Eyewitness Identifications*[1] in preparation for and during the show up; specifically, Williams contends that exigent circumstances justifying the show up did not exist, the detectives failed to record certain environmental conditions and possible impairment factors affecting McGinnis, the show up did not occur at "a non-law enforcement location," and the detectives "failed to provide any reassurance to the witness that one of the purposes of the procedure was to exculpate the innocent." (Memo. Supp. Mot. Suppress 12-13.) Additionally, Williams argues that, under the circumstances here, an evaluation of the reliability factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), mandates that the identification of Williams be suppressed. (*Id.* at 11-12, 14-16.)

If the Court does not grant Williams's Motion To Suppress, Williams requests funds to hire an eyewitness expert to testify at trial. In support of his Motion for Funds, Williams argues that he will be "prejudiced by the lack of expert assistance in preparing for his defense" and that "denial of such assistance would result in a fundamentally unfair trial without the testimony of the expert." (Mot. for Funds 2.) Williams requests $17,000 for the eyewitness expert. (*Id.*)

## B. *The Commonwealth's Response*

The Commonwealth argues that McGinnis's identification of Williams is admissible. In support thereof, it notes that "McGinnis provided a description to [police] immediately after the incident that included [Williams's] race and sex, hairstyle, approximate height and weight, and details about his clothing." (Resp. to Mot. to Suppress 2.)

Referring to the reliability factors set forth by the Supreme Court of the United States in *Biggers*, the Commonwealth argues that McGinnis had the opportunity to view the lead attacker, whom he alleges was Williams, when the two of them "were about three feet apart during this incident," and McGinnis could see "'all of [Williams's] eyes' and his forehead from the tip of his nose up" and "'little dread[lock]s hanging out of his hat.'" (*Id.* at 3.)

Regarding McGinnis's degree of attention at the time of the offense, the Commonwealth argues that the "lighting present at the crime scene allowed McGinnis to focus attention on the parts of [Williams's] face that he could see . . . and provide a description to detectives that night." (*Id.*) The Commonwealth noted that McGinnis declared "the blank stare on [Williams's] face 'unforgettable.'" (*Id.*)

---

[1] Williams appears to be referencing the policy that can be found at: http://www.dcjs.virginia.gov/cple/sampleDirectives/manual/2-39_2014-03-19.pdf. Although the recommended procedures contained therein certainly appear to support enhancement of the reliability of show-up identifications, no evidence was offered to the Court indicating that the policy is binding on, or otherwise has been adopted by, the Norfolk Police Department.

In reference to the accuracy of McGinnis's description, the Commonwealth argues that the description was "consistent as far as [Williams's] age, hairstyle, [and] jacket color, [as well as his] approximate height and weight." (*Id.*) Although Williams was not wearing a head or face covering during the show up — and the descriptions McGinnis provided of the color of Williams's bandanna and jacket varied — the Commonwealth asserts that "McGinnis's descriptions generally matched [Williams's] appearance at the show up." (*Id.* at 3-4.)

Concerning McGinnis's level of certainty at the show up, the Commonwealth states that McGinnis was told that "there was someone detained at another location, but made no guarantees or statements regarding [the detectives'] beliefs concerning whether this was the same individual that had robbed McGinnis earlier that evening." (*Id.* at 4.) One of the detectives read McGinnis a show-up admonishment prior to the actual show up. (*Id.*) The Commonwealth points out that, at the show up, McGinnis immediately identified Williams as his attacker. (*Id.*)

Lastly, the Commonwealth argues that only about thirty minutes passed between the time the detective arrived at the crime scene and the show up, implying that McGinnis's memory was fresh. (*Id.*)

The Commonwealth argues that because the show-up identification satisfies the *Biggers* factors regarding reliability, the identification is admissible, even if the show up had some suggestive elements. (*Id.* at 4-5.)

In response to Williams's Motion for Funds, the Commonwealth argues that the motion should be denied because "the proposed expert testimony would invade the province of the jury," noting that "the [Virginia] Court of Appeals held that the trustworthiness of eyewitness observations 'is not generally beyond the common knowledge and experience of the average juror.'" (Resp. to Mot. for Funds 1-2 (quoting *Currie v. Commonwealth*, 30 Va. App. 58, 64, 515 S.E.2d 335, 338 (1999).) The Commonwealth also argues that "the Defendant has not offered the 'particularized need which would be addressed by the expert testimony he proposes,' as required by the Virginia Court of Appeals." (*Id.* at 2, quoting *Payne v. Commonwealth*, 65 Va. App. 194, 221, 776 S.E.2d 442, 455 (2015).) Williams, the Commonwealth asserts, "can challenge the reliability of eyewitness testimony . . . during cross-examination and closing argument." (*Id.* at 3.)

*Analysis*

A. *Legal Standard*

When responding to a motion to suppress, the Commonwealth has the burden to prove admissibility of the challenged evidence by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

An identification procedure may be so unnecessarily suggestive and prone to misidentification that the accused is denied due process of law.

*Stovall v. Denno*, 388 U.S. 293, 302 (1967). When challenged, an out-of-court identification is only admissible if: "(1) the identification was not unduly suggestive; or (2) the procedure was unduly suggestive, but the identification was so reliable that there is no substantial likelihood of misidentification." *Charity v. Commonwealth*, 24 Va. App. 258, 262, 482 S.E.2d 59, 60 (1997).

"Show-up identifications are not per se violative of constitutional rights, and such identifications will not be declared invalid unless a review of the totality of the circumstances shows a substantial likelihood of misidentification." *Dance v. Commonwealth*, 32 Va. App. 466, 472, 528 S.E.2d 723, 727 (2000) (internal citation omitted). Nevertheless, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall*, 388 U.S. at 302.

A show-up identification does not violate due process if "under the totality of circumstances the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Courts should analyze five factors when evaluating such reliability: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 199-200; accord Charity, 24 Va. App. at 262, 482 S.E.2d at 61. The *Biggers* factors must be balanced "against the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

## Discussion

### A. *Motion To Suppress*

#### 1. *The Show Up of Williams Was Unnecessarily Suggestive*

Although show-up identifications do not *per se* violate constitutional due process, they will pass constitutional muster only if, based on the totality of the circumstances, there is a substantial likelihood of reliable identification. *Dance v. Commonwealth*, 32 Va. App. 466, 472, 528 S.E.2d 723, 727 (2000). The Supreme Court of the United States nevertheless has looked upon show-up identifications with suspicion, opining that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967). Courts have interpreted this language as an acknowledgement by the Supreme Court of the United States that show ups are inherently suggestive. *See, e.g., Brisco v. Ercole*, 565 F.3d 80 (2d Cir. 2009); *accord United States v. Brownlee*, 454 F.3d 131, 138 (3d Cir. 2006);

*Gregory v. City of Louisville*, 444 F.3d 725, 755 (6th Cir. 2006); *United States v. Singleton*, 702 F.2d 1159, 1165-66 (D.C. Cir. 1983); *United States v. Sanders*, 547 F.2d 1037, 1040 (8th Cir. 1976). *But cf. United States v. Bell*, 594 Fed. Appx. 771, 774 (4th Cir. 2014) (unpublished opinion) ("Prompt, on-the-scene show-ups are not per se suggestive.").

In the case at bar, the show up occurred at night, at a separate crime scene five to ten miles from the scene of McGinnis's attack, with numerous patrol cars and at least eight other law enforcement officers present. Williams most likely was wearing handcuffs and was removed from the back of a patrol car for the purposes of conducting the show up. High-beam headlights were shined on Williams while a detective held one or two flashlights, at close range, illuminating his face. Because Williams apparently was in custody as a result of the incident at the second crime scene, there was no exigency in conducting the identification via show up. The Commonwealth argues that the value of conducting the show up shortly after the attack outweighs any suggestiveness resulting from the one-on-one show up. The Court disagrees. There was no testimony indicating any difficulty in generating a photo or in-person lineup or that McGinnis would soon become unavailable. Moreover, the fact that McGinnis had consumed two alcoholic beverages and had suffered a head injury shortly before the show up weighs heavily against any exigency. Given the facts and circumstances surrounding McGinnis's identification of Williams, the show up was suggestive, and unnecessarily so.

## 2. *The Identification of Williams Was Not Reliable*

"Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). Notwithstanding that condemnation, the U.S. Supreme Court has held that when the police use a suggestive eyewitness identification procedure, "reliability is the linchpin" in determining whether an eyewitness identification is admissible. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). The question, therefore, is whether McGinnis's identification of Williams was so reliable that there is no substantial likelihood of misidentification. Reliability is determined by evaluating the factors set out in Biggers.

### a. *McGinnis's Opportunity To View Williams at the Time of the Crime*

McGinnis testified that, at the time of his attack, which was at night with lighting only from a nearby streetlight, he initially did not see his attackers. He was hit from behind, pushed to the ground, kicked by his attackers, and tried to "cover and hold up [his] arm" to protect himself.

McGinnis saw the individual referred to as the "lead" attacker — from approximately three feet away —only after he rolled over during the attack, providing him only a very brief period of time during which he could observe his attacker. The attackers apparently immediately fled thereafter, simultaneously shooting in McGinnis's direction. McGinnis's opportunity to view the lead attacker's physical features during his brief observation of him also was limited, as McGinnis testified that the bottom half of his attacker's face — from the bridge of the nose down — was obscured by a bandanna. Overall, McGinnis's opportunity to view Williams during the assault was very limited.

### b. *McGinnis's Degree of Attention*

The incident undoubtedly was a stressful situation for McGinnis, as he was the victim of an unprovoked attack by multiple assailants. As pointed out, McGinnis testified that he was hit from behind, pushed to the ground, and kicked by his attackers. Additionally, shooting apparently occurred soon after the initial attack and continued until the attackers fled the scene; bullets were directed both at McGinnis and at his nearby home, where his girlfriend and five children were located. McGinnis also suffered a head wound during the incident. He testified that with a black semiautomatic handgun pointed at him at close range, he "could not stop looking at [it]," and he was "[c]oncerned" about his family. Although the lead attacker's face was only three feet away from him, McGinnis's attention understandably was directed elsewhere, at *other* than focusing on his attacker's physical features.

### c. *The Accuracy of McGinnis's Prior Description of His Assailant*

McGinnis provided a description of his attackers to law enforcement very shortly after the attack. According to Detective Frenier, McGinnis reported that the lead attacker was a "black male, about six feet tall, maybe 180 to 190 pounds, small dreadlocks and a red bandanna across his face . . . [w]earing tan pants, light shirt, . . . [and] a jacket of some sort[,] . . . not like a sweater, thicker than a hoodie-type sweater." Consistent with that description, Detective Peirsol testified that McGinnis told him at the scene that the attacker was wearing "a white T-shirt and tan pants." At the preliminary hearing, McGinnis's testimony about the attackers' description was different from what he told the detectives at the scene. There, McGinnis described the lead attacker as having a light build, standing 5'10" or 5'11", weighing *150 to 170 pounds*, with very short black dreadlocks, wearing *dark clothes, dark jean pants,* a lightweight jacket, a *black-and-white bandanna* covering his nose and the bottom half of his face, a hat or hood, and *dark-colored boots*.

Williams is a young black male, approximately 5'10" tall, who wore short, dark dreadlocks at the time of the show up. It is undisputed that, at the show up, he was wearing light-colored boots, washed-out jeans, and a black hooded sweatshirt. He was not wearing a bandanna, white T-shirt, or tan pants, and none of these items was in his possession or found in the vicinity. No explanation was provided for the difference in appearance, over the short time period, between McGinnis's attacker — as described to the detectives — and Williams, and no clothes matching those in McGinnis's on-scene description were found. McGinnis did not note any distinguishing physical characteristics of his attackers when describing them to detectives, but instead identified Williams based on the "blank stare" on his face.

Considering all of the evidence, the Court finds the disparity between McGinnis's on-scene description of his attackers and Williams's appearance at the show up, as well as the vagueness of the "matching" physical characteristics, to be significant. The Court also finds it troubling that McGinnis's on-scene description of Williams's clothing is vastly different from his related testimony at the preliminary hearing — and that his latter description coincidentally is much closer to what Williams was actually wearing during the show up.

The Court nevertheless believes that McGinnis's descriptions and testimony were sincere and well-intentioned, and recognizes that his accounts must be viewed against the backdrop of what must have been a startling and terrifying experience.

### d. *The Level of Certainty Demonstrated by McGinnis at the Confrontation*

During the time between the attack and when the detectives responded to the 911 call, McGinnis admitted to drinking some wine and taking a shot of liquor. One responding detective noted a possible faint odor of alcohol from McGinnis, although he did not believe that McGinnis was drunk; the other detective did not smell any alcohol. Following a show-up admonishment administered by the detectives, McGinnis was taken to the show up, where he immediately identified Williams, stating "Yeah, that's him."

Although Williams argued in court that McGinnis's immediate identification evidences his failure to fully examine Williams before positively identifying him, the Court is not persuaded by that logic. Rather, the Court finds that McGinnis's quick, unwavering identification evidences his conviction. The Court nevertheless is troubled by McGinnis's stated basis for his certainty, *i.e.*, Williams's "blank stare," which McGinnis described as "unforgettable." McGinnis only had a very brief opportunity to see the "blank stare," which was visible only from the bridge of the nose to the forehead, as the rest of his attacker's face was covered by a bandanna. The Court also seriously questions whether the appearance of McGinnis's assailant's "blank stare" in the nighttime lighting outside McGinnis's

residence would be substantially similar to Williams's appearance 50 feet from high-beam automobile headlights with one or two additional close-range flashlights pointed at his face. This is consistent with Williams's statement that, under the lighting conditions, he "could not even tell you what the car looked like."

### e. The Length of Time Between the Crime and the Confrontation

McGinnis's description of his attackers was provided to detectives shortly after the incident, and the show up identification occurred less than an hour after that. There was little time for the deterioration of McGinnis's memory, and the Court finds the minimal passage of time indicative of reliability. The short timeframe also supports the accuracy of McGinnis's *initial* description to the detectives of the attacker's clothing, which the detectives recorded.

The Court balances the *Biggers* reliability factors against "the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). Particularly significant to the Court are the environment and conduct of the show up and the disparity between Williams's clothing and McGinnis's initial description of the lead attacker's clothing. The show up occurred under the following conditions: at night; at another crime scene five to ten miles away from McGinnis's house; with numerous patrol cars and at least eight other law enforcement officers present; with Williams as the only suspect shown to McGinnis; with Williams having been removed from a patrol car and illuminated by a police vehicle's high-beam headlights and one or two close-range flashlights; and with Williams most likely in handcuffs. Although the show up occurred within an hour of McGinnis's attack, the differences between McGinnis's initial description of the lead attacker's clothing and Williams's clothing was significant and without explanation; in fact, the only substantial similarities between the appearance of McGinnis's lead attacker and Williams are that each is a "black male" with "small dreadlocks." The reliability of the show-up identification here, which is based on such scant evidence tying McGinnis's lead attacker to Williams, cannot overcome "the corrupting effect of the suggestive identification itself."

Based on the totality of the circumstances, including the facts surrounding the show up and the *Biggers* reliability factors, the Court finds that, in addition to the show up being unnecessarily suggestive, the resulting identification was not sufficiently reliable to preclude a substantial likelihood of misidentification. McGinnis's pretrial identification of Williams, therefore, is not admissible at trial.

Notwithstanding this ruling, "an in-court identification by [the same out-of-court] witness is still admissible if it has an origin independent of the inadmissible out-of-court identification." *Wise v. Commonwealth*, 6 Va. App. 178, 186, 367 S.E.2d 197, 202 (1988).

## B. *Motion for Funds for Eyewitness Expert*

Because the Court has suppressed the pretrial identification of Williams by McGinnis, Williams's request for an expert on eyewitness identification is moot. Counsel for Williams at the suppression hearing agreed that, should the Court grant Williams's Motion To Suppress, the Motion for Funds would be moot. (SH Tr. 93.) The motion for funds for an eyewitness expert, therefore, is denied.

## *Conclusion*

The Court finds, based on the facts and circumstances present in this case, that the show up at which McGinnis identified Williams was unnecessarily suggestive. Further, McGinnis's identification of Williams at the show up lacked sufficient reliability to overcome the suggestive nature of the show-up identification. The Court finds that the Commonwealth has failed to satisfy its burden of proving admissibility of the challenged evidence by a preponderance of the evidence, and the Court therefore suppresses all out-of-court and in-court identifications by McGinnis of Williams stemming from the show-up identification of Williams.

For the foregoing reasons, the Court grants the Motion To Suppress. Because the granting of the Motion To Suppress moots the need for an eyewitness expert, the Court denies the Motion for Funds.