COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Malveaux and Senior Judge Frank
Argued at Newport News, Virginia

**PUBLISHED**

DAQUAN LAMAR SCOTT

v.        Record No. 1900-16-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
JANUARY 30, 2018

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
James C. Hawks, Judge

W. McMillan Powers, Assistant Public Defender, for appellant.

John I. Jones, IV, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

On September 21, 2016, in the Circuit Court for the City of Portsmouth (the "circuit court"), Daquan Lamar Scott ("Scott") was convicted of two counts of robbery, in violation of Code § 18.2-58. On appeal, Scott argues that the circuit court erred in denying his motion to suppress all evidence of his identification by the victims based on an impermissibly suggestive show-up identification, which was a violation of his right to due process.

## I.  BACKGROUND

Taken in the light most favorable to the Commonwealth, the evidence is that on March 13, 2016, between 10:00 p.m. and 10:30 p.m., Stephen "Chance" Carr ("Carr") drove with his girlfriend, Jamie Carroll ("Carroll"), to a CVS pharmacy ("CVS") in Portsmouth. There, Carr exited his vehicle to look for a movie at a Redbox machine while Carroll remained inside the vehicle. Subsequently, an individual later identified as Scott opened Carroll's door and put a gun to Carroll's head. Scott was wearing a ski mask that covered his face, with only his eyes visible. Scott snatched Carroll's debit card and iPhone from Carroll's hand, and demanded more.

Scott eventually noticed Carr and ordered Carr into the vehicle at gunpoint. Scott then threatened to kill both Carr and Carroll if they did not look at the ground. Scott "snatched [Carroll's] bag from in between [her] feet[,]" asked for more, and demanded Carr's iPhone. Scott fled the scene after Carr complied. The robbery lasted between five and ten minutes. At least one other person joined Scott as he fled the scene toward a vacant field, located behind the CVS.

Following the robbery, Carr and Carroll drove across the street to a 7-Eleven store to call the police. When the dispatcher asked for a description of the robber, Carr replied that the robber was an African-American male, approximately six feet tall, and wearing a dark hooded jacket, dark pants, and a ski mask. Portsmouth police arrived at the scene within three to five minutes of Carr's phone call.

Portsmouth Police Officer Gillett ("Officer Gillett") observed three individuals matching the description of the robbery suspect less than half a mile from the CVS. Officer Gillett stopped and made a U-turn to go back and speak with the three individuals. When Officer Gillett attempted to make contact, the three individuals responded by fleeing, eventually splitting up. Officer Gillett's canine partner, Roscoe, apprehended one of the individuals, who was later identified as Scott, against a wall at a nearby Red Barn gas station. Scott, however, escaped Roscoe and continued running until he was detained in a nearby field by Portsmouth Police Officer Moore ("Officer Moore").

Upon searching Scott, officers discovered Carr and Carroll's iPhones in Scott's pocket. Officers also discovered a black, .22 caliber revolver on the ground at the Red Barn near where Roscoe made the initial apprehension of Scott. Searching a field directly adjacent from the Red Barn where officers initially saw Scott and the two other individuals who fled, officers located a

leather backpack. The backpack contained a black ski mask, two black leather hooded jackets, and a white tank top.

After detaining Scott, Portsmouth Police Officers O'Neil and Rios ("Officer O'Neil" and "Officer Rios") separated Carr and Carroll at the 7-Eleven. Subsequently, Officer O'Neil notified Carr that a potential suspect had been detained and that Carr was going to be brought to view the potential suspect for identification purposes—the show-up. Officer O'Neil indicated that, if Carr did not believe that the individual being detained was the robber, the individual would be "kicked loose." Thereafter, Officer O'Neil placed Carr in the backseat of her police cruiser and drove to the Red Barn where Scott was being detained.

When Officer O'Neil arrived with Carr at the Red Barn, Scott was seated inside a police cruiser. Scott was then brought out of the police cruiser, in handcuffs, so that Carr could get a clear view. Carr immediately identified Scott as the robber. When Officer O'Neil asked Carr how he could identify Scott as the person who robbed him, Carr answered that "the ski mask did not cover his entire face and that he could tell based on his facial features." Officer Rios separately transported Carroll to identify Scott in the same manner. Upon viewing Scott, Carroll immediately identified Scott as the robber. Scott was subsequently arrested and charged with two counts of robbery and two counts of the use of a firearm in the commission of a felony. After transporting Scott to jail, officers searched Scott a second time. With Officer Moore watching the entire time, the searching officer discovered a .22 caliber cartridge in one of Scott's pockets. "The cartridge was of the same make and model as those in the [revolver]" recovered from the Red Barn.

The circuit court held separate suppression hearings regarding both Carr and Carroll's show-up identifications. Testifying to the accuracy of his show-up identification, Carr indicated that "there [was] no doubt in [his] mind" that Scott was the robber. Carr testified that he based

his identification of Scott on Scott's skin color, clothing, eyes, and facial structure. Similarly, Carroll testified that she was "one-hundred percent" certain in her show-up identification and that Scott was the robber. Carroll emphasized that she immediately recognized Scott and based her identification on Scott's "body structure, . . . clothes, [and] the shape of his face." Specifically, Carroll stated that "when it happened, [Scott] was standing right on top of me. You don't forget a person like that." Carroll denied that officers made any suggestions or encouraged a positive identification of Scott.

After recounting their show-up identifications, both Carr and Carroll made in-court identifications of Scott as the robber. The circuit court denied each motion without elaboration.

On September 20, 2016, a two-day jury trial commenced. There, both Carr and Carroll denied that officers made any statements or took any actions to encourage or force a positive identification of Scott. Officers O'Neil and Rios also testified that both Carr and Carroll were unaware that officers had discovered their iPhones on Scott's person prior to the show-up identifications. According to Carroll, the officers "let me know that if it wasn't him to not identify it was him." Further, Carroll identified the revolver discovered by officers as the gun that she was robbed with. After testifying about the robbery and the events that followed, both Carr and Carroll made in-court identifications of Scott as the robber. Officers Gillett, Moore, and O'Neil also testified for the Commonwealth.[1] Scott testified in his own defense and denied that he possessed a gun and robbed Carr and Carroll the night of March 13, 2016.

On September 21, 2016, the jury found Scott guilty of two counts of robbery. However, the jury acquitted Scott of two counts of using a firearm in the commission of a felony. On September 22, 2016, Scott moved to set aside the verdict as contrary to the law, which the circuit court denied. Subsequently, the circuit court imposed the sentenced fixed by the jury—five

---

[1] Officer Rios also testified after being called by Scott's attorney.

years of imprisonment on each robbery conviction.  Scott now challenges the circuit court's denial of his motion to suppress because both Carr and Carroll identified him based on allegedly suggestive show-up identifications.

## II.  ANALYSIS

### A.  Standard of Review

When this Court reviews a trial court's ruling on a motion to suppress, "the appellant bears the burden of showing that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error."  Sanders v. Commonwealth, 64 Va. App. 734, 743, 772 S.E.2d 15, 19 (2015) (quoting McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (*en banc*)) (internal quotation marks omitted).  This Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  McGee, 25 Va. App. at 198, 487 S.E.2d at 261.

### B.  Whether the Circuit Court Erred in Denying Scott's Motion to Suppress

Scott argues that the circuit court erred in denying his motion to suppress.  Specifically, Scott claims that both Carr and Carroll's show-up identifications were impermissibly suggestive and violated his right to due process.  As a result, Scott argues that "the [circuit] court erred in failing to suppress the in court identification of [Scott] by both Carr and Carroll based on the impermissibly suggestive [show-up] identification."  In support, Scott points to various inconsistencies in the identification testimony of both Carr and Carroll at the suppression hearings and at trial.  Scott also alleges that the responding officers utilized unduly suggestive procedures to obtain a positive identification.

Here, both Carr and Carroll identified Scott as the robber during separate show-ups.  A show-up is a type of out-of-court identification where the police return a potential suspect or

victim to the vicinity of the crime for the potential suspect's immediate identification. See, e.g., Martin v. Commonwealth, 210 Va. 686, 691, 173 S.E.2d 794, 798 (1970). "Show-up identifications are not *per se* violative of constitutional rights, . . . and [they] will not be declared invalid unless a review of the totality of the circumstances shows a substantial likelihood of misidentification." Dance v. Commonwealth, 32 Va. App. 466, 472, 528 S.E.2d 723, 726 (2000) (referencing Smith v. Thompson, 1 Va. App. 407, 411, 339 S.E.2d 556, 558 (1986)); see also Delong v. Commonwealth, 234 Va. 357, 366, 362 S.E.2d 669, 674 (1987) (stating that the determination of whether a "'one-on-one' confrontation between a witness and a suspect" violated the constitution "depends on the totality of the circumstances"), cert. denied, 485 U.S. 929 (1988).

Examining the circumstances of both Carr and Carroll's show-up identifications, we find no violation of Scott's due process rights. Shortly after the commission of the crime and after apprehending Scott, responding officers informed Carr and Carroll that a potential suspect was being detained and that they needed to determine whether the potential suspect was involved in the robbery. Subsequently, Officers O'Neil and Rios separated Carr and Carroll to conduct separate show-up identifications. Both Carr and Carroll were specifically advised that the suspect may or may not be the robber. After being transported to the Red Barn where Scott was being detained, both Carr and Carroll immediately identified Scott as the man that robbed them approximately twenty minutes earlier. Additionally, both Carr and Carroll articulated a number of reasons for their positive identification of Scott as the robber, including Scott's facial features, height, weight, body structure, and clothing.

During the suppression hearings and at the trial, both Carr and Carroll denied that officers made any suggestions or encouraged a positive identification of Scott. And, while Scott was handcuffed and flanked by police officers during both show-up identifications, the circumstances

in their entirety do not rise to the level of a constitutional violation as envisioned by the United States Supreme Court in United States v. Wade, 388 U.S. 218 (1967), Gilbert v. California, 388 U.S. 263 (1967), and Stovall v. Denno, 388 U.S. 293 (1967).[2]  A show-up identification by its very nature may be more suggestive than a multi-person lineup or photo array but that does not automatically render its use unconstitutional.  The United States Supreme Court has recognized that it may be the most practical way to confirm or dispel an officer's belief that a suspect is the perpetrator of a crime.  Cf. United States v. Sharpe, 470 U.S. 675, 685-86 (1985) (assessing the length of detention by whether the police "diligently pursued" their investigation).  The "police action in returning the suspect to the vicinity of the crime[,]" or bringing a witness or victim to view a suspect for immediate identification, "fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is still fresh."  Martin, 210 Va. at 691, 173 S.E.2d at 798 (quoting Bates v. United States, 405 F.2d 1104, 1106 (D.C. Cir. 1968)).  Further, contrary to Scott's arguments, exigent or special circumstances are not a prerequisite to such confrontations and the fact that no exigency existed is not determinative of suggestiveness.  Rather, "a court must look to the totality of the circumstances to determine whether there was a substantial likelihood of misidentification."  Smith, 1 Va. App. at 411, 339 S.E.2d at 558 (referencing Manson v. Braithwaite, 432 U.S. 98, 116 (1977)).  As a result, the circuit court did not err in denying Scott's motion to suppress.

Because the show-up identifications were not unconstitutionally suggestive, we need not analyze whether the circuit court erred in failing to suppress Carr and Carroll's in-court identifications of Scott under Neil v. Biggers, 409 U.S. 188 (1972) (articulating five factors that

---

[2] In three cases decided the same day—Wade, Gilbert, and Stovall—the Supreme Court of the United States collectively held that suggestive out-of-court identification procedures utilized by police can violate due process principles by tainting an in-court identification.

a trial court should consider in evaluating the *admissibility* of an in-court eyewitness identification when there has been a previous, possibly tainted out-of-court identification that violated due process principles), or whether any error was constitutionally harmless.

### III.  CONCLUSION

For the reasons stated above, the judgment of the circuit court is affirmed.

Affirmed.