# COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Chaney and Lorish
Argued at Lexington, Virginia

KEYON DA'MONTA PETTY

v.      Record No. 1117-23-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE RICHARD Y. ATLEE, JR.
APRIL 22, 2025

FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
J. Frederick Watson, Judge

(Jim D. Childress, III; Childress Law Firm, PC, on brief), for
appellant. Appellant submitting on brief.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Following a three-day jury trial, the trial court convicted Keyon Da'Monta Petty of three

counts of robbery, three counts of use of a firearm in the commission of a felony, possession of a

handgun as a minor, and participation in a criminal street gang.[1]  On appeal, he argues the trial court

erred in denying his motion to suppress an out-of-court identification.  He contends that law

enforcement employed a "show-up" identification procedure that was so unduly suggestive and

unreliable that it violated Petty's due process rights.  For the following reasons, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The trial court granted the prosecutor's motion to *nolle prosequi* a charge for one count of possession of a Schedule I or II controlled substance. It also granted Petty's motion to strike a charge of attempted theft of an automobile. At a later bench trial, the trial court convicted Petty of possession of a firearm by a non-violent felon.

## I. BACKGROUND

"On appeal of criminal convictions, we view the facts in the light most favorable to the Commonwealth, and [we] draw all reasonable inferences from those facts." *Payne v. Commonwealth*, 65 Va. App. 194, 198 (2015). So viewed, the facts are as follows.

Witness, and victim, Kelsi Buzzanca arranged via Facebook marketplace to sell an iPhone to someone with the profile name "RedDot Hitta."[2] Before arranging a meet-up, she had spoken to and, because some of the public Facebook profile photos looked like different people, video-chatted with, the person who messaged her about buying the phone.

On the afternoon of October 7, 2021, Buzzanca went to a pre-arranged meeting location and saw a group of people on the street. Buzzanca was in the front passenger's seat. Richard Atkins was driving, and Buzzanca's mother and young son were back seat passengers. Buzzanca video-called "RedDot Hitta" to confirm that he was among the group; when he said he was, Atkins drove up towards them. The group consisted of four young Black men, who approached the car. The person she had spoken with came up to Buzzanca's window. She testified that he was wearing a black shirt with a red triangle with "designs in it" on the chest. She testified that one of the others was wearing "all white" and another wore a red shirt with a white Adidas logo on the chest. She "kind of forgot" what the fourth man was wearing "because he wasn't . . . [her] main focus at the time."

When Buzzanca asked for payment from the person identified as "RedDot Hitta," he pulled out a handgun. The other three young men also pulled out firearms and surrounded the car, one person at each window. The man wearing all white, who was standing at the window

---

[2] At trial, a detective testified that this Facebook profile belonged to someone else other than Petty or his companions, but nevertheless, every time Buzzanca spoke to "RedDot Hitta," she was speaking, or video-chatting, with Petty.

closest to where Buzzanca's son was sleeping, ordered everyone to get out of the vehicle and proceeded to search them. When he did not find anything he wanted on them, he ordered Buzzanca, her mother, and son back into the car. Atkins had been taken "down the road" during this time. The young man wearing all white was standing less than two feet from Buzzanca. It was a clear day with no visibility issues.

The man wearing white, later identified as Petty, tried to find the car keys and start the car. While searching, he was within an "arm's distance" of Buzzanca. He became frustrated when Buzzanca told him the car was a button "push start" model. He "got mad" and left the car to ask Atkins questions while another of the men kept an eye on Buzzanca and the other passengers. Buzzanca watched as they tried to get Atkins to unlock his phone, and when he said "he didn't know the password," they demanded he throw it and then get back in the car. Someone fired their handgun as Atkins fled. Buzzanca estimated the entire encounter took place over 15 to 20 minutes.

Within about four minutes of the robbers' departure from the scene, the victims flagged down a passing police car and reported the robbery, noting that one of the robbers had worn a white shirt. A report went out on dispatch that four male juveniles had committed a robbery, that a handgun had been fired, that one of the assailants wore a white shirt, and that they had "taken off on foot heading towards Fourth Street from Jackson [Street]."

Approximately one minute after hearing the dispatch report, another patrol officer in the area, Officer McCraw of the Lynchburg Police Department, saw "one juvenile [B]lack male wearing a black shirt and a black vest, one juvenile [B]lack male wearing [a] red patterned shirt and blue jeans," "one juvenile male wearing a black hoody and black sweats," and one "juvenile male wearing a white jacket with no shirt and jean shorts" carrying a black backpack. McCraw was in a marked police cruiser. She noted the young men sped up their pace when they saw her,

and initially they did not respond when she spoke to them. Eventually three of them stopped, but one, the man in a white jacket with no shirt underneath, later identified as Petty, kept walking. When McCraw told the three that stopped about the situation, they "instantly became verbally argumentative" and denied knowing anything. As other officers arrived on the scene, they became further "agitated" and "uncooperative"; they "began saying fuck the police and started walking away." Officers detained and cuffed the three men within approximately five minutes of McCraw first encountering them. This all took place around three blocks from the location of the robbery, within minutes after it occurred. Soon after, McCraw found Petty on the front porch of a nearby house. He had a backpack sitting behind him, in which law enforcement found, among other things, four firearms. Petty was handcuffed and brought to where the others were detained.

Other officers who arrived on the scene included Officers Dickman and Begley, and Detective Dubie, all employees of the Lynchburg Police Department. Officer Dickman testified that Atkins was "the primary person who gave descriptions on scene." He told the officers that one of the robbers wore black pants and a red jacket and that one of the assailants was a "younger gentleman" with a "skinnier kind of muscle build." He described all the robbers as young Black males. There is no record of Buzzanca giving a contemporaneous description of the height, build, features, or clothing worn by the robbers beyond what she told the officer she initially flagged down.

The police asked Buzzanca and Atkins if they would be willing to participate in a "show-up" identification procedure, in which each of them would be separately driven in an unmarked police car approximately 25 to 30 feet from where the suspects were handcuffed. Dubie explained that they had "four people up the road detained," and he asked if Buzzanca was willing to see if the detained individuals "match[ed]." Buzzanca agreed and said she would try.

As Dubie and Buzzanca approached the four juveniles, Dubie stated: "These are the kids we have." Begley further told the victims that the juveniles "may or may not be" the robbers. Buzzanca said she recognized all four of the young men, and she positively identified the four young men as the robbers, including Petty. When asked at trial to assign a number to her degree of certainty, Buzzanca said she was about 80% sure it was them. She also testified that she was "pretty sure" of her identification because the robbers had been "mad close" to her. She noted Petty in particular, saying he had "a smart mouth." The young men were placed under arrest. All of this occurred within approximately 20 to 30 minutes from McCraw encountering Petty.

Investigators later found a Facebook Live video, posted to Petty's account, recording him with his three companions in the area of the crime, wearing the same clothes as when they were apprehended, with Petty wearing a mostly white jacket with no shirt underneath and very light-colored jean shorts. In this video, which Petty filmed and was most prominent in, the four men repeatedly flashed gang signs, proudly displayed a variety of firearms, and discussed carrying out gang-related crimes. A black backpack, matching the one found with Petty when he was apprehended, also appeared in the video. Dubie testified that the firearms displayed in the video matched those recovered later from the backpack found with Petty.

Pre-trial, Petty filed a motion to suppress the out-of-court identification, arguing that it was unduly suggestive and not sufficiently reliable, and thus was inadmissible because it violated his due process rights. The trial court initially agreed that the show-up procedure was suggestive, prompting it to go through the factors set out in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).[3] It observed first that Buzzanca had ample opportunity to view the defendant, it

---

[3] Under *Biggers*, and echoed in our case law,

> the factors to be considered in evaluating the likelihood of
> misidentification include the opportunity of the witness to view the

- 5 -

being a clear day, the encounter lasting around 20 minutes, the fact that the perpetrators did not cover their faces, that there were no impediments to her ability to observe them, and particularly how close she was in proximity to the defendant. It also found that "she was an attentive witness." It had "some concern" over the lack of evidence of a prior description of the defendants before she took the stand, noting that the show-up could have influenced her description, although it acknowledged that this concern was "speculative." It found Buzzanca expressed "a high level of certainty," finding that "[e]ighty percent seems pretty high to me," and that it is "concerned any time anyone says they're a hundred percent sure of anything." Finally, it noted how brief the window of time was between the robbery and Buzzanca's positive identification. Ultimately, taking all of this into account, the trial court concluded that the show-up identification was sufficiently reliable,[4] and it denied Petty's motion.

Following a jury trial, Petty was found guilty of three counts of armed robbery, three counts of use of a firearm in the commission of robbery, one count of possession of a handgun as a minor, and one count of felony criminal street gang participation.[5] He received a total sentence of 54 years and 12 months' incarceration with all but 25 years suspended. This appeal followed.

---

> criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.

[4] It also concluded that the identification procedure was not "impermissibly suggestive." When asked for clarification, it said that because it found the identification was suggestive, it decided to apply the *Biggers* reliability factors, after which it not only found that the identification was reliable, but also that it was not "impermissibly," or unduly, suggestive.

[5] Although Petty was a minor at the time of the offense, he was tried as an adult.

## II. ANALYSIS

Petty's sole assignment of error concerns the legality, and thus admissibility, of the results of the "show-up" identification employed here. Petty emphasizes his belief that Lynchburg Police Department policy does not support performing eyewitness identifications in the manner done here. We assume without deciding that the procedure was unduly suggestive, but because multiple indicia show that it was nonetheless inherently reliable, it did not violate Petty's due process rights. *See Commonwealth v. Swann*, 290 Va. 194, 196 (2015) ("The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available,'" which includes avoiding adjudicating constitutional issues unnecessarily. (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).

### A. *Standard of Review*

"In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)). "While we are bound to review *de novo* the ultimate questions of reasonable suspicion and probable cause, we 'review findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021) (alteration in original) (footnote omitted) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

### B. *Admissibility of the Out-of-Court Identification*

"Evidence of an out-of-court identification is admissible at trial if either '(a) the identification was not unduly suggestive, or (b) the procedure was unduly suggestive, but the identification is nevertheless so reliable . . . that there is no substantial likelihood of misidentification.'" *Logan v. Commonwealth*, 51 Va. App. 111, 115 (2008) (alteration in original)

(quoting *Hill v. Commonwealth*, 2 Va. App. 683, 693 (1986)). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive *and* unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012) (emphasis added). "It is not enough that the procedure 'may have in some respects fallen short of the ideal.'" *Sample v. Commonwealth*, 303 Va. 2, 10 (2024) (quoting *Sexton v. Beaudreaux*, 585 U.S. 961, 966 (2018)). Although "[a] show-up identification by its very nature may be more suggestive than a multi-person lineup or photo array," "that does not automatically render its use unconstitutional." *Scott v. Commonwealth*, 68 Va. App. 452, 460 (2018). Therefore, a show-up procedure "will not be declared invalid unless a review of the totality of the circumstances shows a substantial likelihood of misidentification." *Id.* at 459 (quoting *Dance v. Commonwealth*, 32 Va. App. 466, 472 (2000)).

As stated earlier, we assume without deciding that the identification procedure here was unduly suggestive. *See Swann*, 290 Va. at 196. Nevertheless, because multiple indicia reveal that it was so reliable so as to not risk misidentification, we confine our analysis to this second category of admissible out-of-court identifications.

When evaluating the likelihood of misidentification, we consider: (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3) "the accuracy of the witness' prior description of the criminal," (4) "the level of certainty demonstrated by the witness at the confrontation," and (5) "the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200; *see also Sample*, 303 Va. at 12. Ample case law on eyewitness identifications and show-ups makes clear that these are fact-dependent analyses that take the totality of the circumstances into account. *See, e.g.*, *Scott*, 68 Va. App. at 459; *Dance*, 32 Va. App. at 472; *Smith v. Thompson*, 1 Va. App. 407, 411 (1986). Although,

> when the circumstances permit, a lineup is preferable to a
> showup . . . , our task is to decide if the identification procedure
> that was utilized violated due process; not whether that procedure

- 8 -

was the best that the authorities could have employed. Thus, [the] argument on this point is *merely one factor* to be taken into consideration in evaluating the circumstances surrounding the identification procedure.

*Hill*, 2 Va. App. at 703-04 (emphasis added).

Here, the trial court, despite ultimately concluding that the show-up procedure was not impermissibly suggestive, went through and evaluated each of the *Biggers* reliability factors, concluding that, in their totality, they supported a finding that the show-up procedure was reliable. In addition, despite Petty's protests about the suggestive nature of the show-up procedure, including that the suspects here were "handcuffed and flanked by police officers during both show-up identifications," that is in no way dispositive, because here, as in other cases, "the circumstances in their entirety d[id] not rise to the level of a constitutional violation." *Scott*, 68 Va. App. at 460.

Indeed, despite a show-up generally not being a pristine blind identification process, it can serve significant practical considerations. This includes promptly detaining suspects as soon as possible after a crime when they are likely to still be close by, and allowing for a more immediate identification, when a victim's memory is fresh. *See id.* (noting that "bringing a witness or victim to view a suspect for immediate identification, 'fosters the desirable objectives of fresh, accurate identification'" and that this may even "'lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is still fresh'" (quoting *Martin v. Commonwealth*, 210 Va. 686, 691 (1970))). There is nothing in the case law that supports Petty's assertion that being part of a show-up with his co-criminals, as opposed to alone, would per se render Buzzanca's identification unreliable.

Finally, there were many other circumstances present, beyond that identification alone, from which a factfinder could infer Petty's guilt, including the four young men's proximity to the place where the crime occurred, so shortly after it took place, as well as the parallels between Petty's

Facebook live video, including changes of clothing and the fact that the four firearms displayed in the video matched those recovered in Petty's backpack. Considering those circumstances, as well as the trial court's thorough findings and analysis of the totality of the circumstances here, it did not err in finding that the identification was reliable and did not risk misidentification, and ultimately admitting Buzzanca's out-of-court identification. Therefore, finding no reversible error, we affirm.

### III. CONCLUSION

For these reasons, we find the trial court did not err in concluding that the identification process employed here was so reliable that it did not violate Petty's due process rights. Therefore, it did not err in permitting it to be admitted as evidence. Accordingly, we affirm.

*Affirmed.*