COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Causey and Frucci

ZYMEIRE JAQUANTE ROGERS

MEMORANDUM OPINION*

v.      Record No. 0462-24-1

PER CURIAM
OCTOBER 14, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Christopher R. Papile, Judge

(Charles E. Haden, on brief), for appellant.

(Jason S. Miyares, Attorney General; Suzanne Seidel Richmond,
Assistant Attorney General, on brief), for appellee.


Following a conditional guilty plea, Zymeire Jaquante Rogers was convicted of armed

robbery and use of a firearm in the commission of a felony and was sentenced to 13 years of

incarceration, with 10 years suspended.[1] On appeal, Rogers challenges the circuit court's denial

of his motion to suppress the victim's show-up and in-court identifications of him as the robber

and any evidence resulting from the show-up identification.[2]

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Rogers was also charged with conspiracy to commit armed robbery, brandishing a
firearm, and failing to appear. Those charges were nolle prossed as part of the plea agreement
between the Commonwealth and Rogers.

[2] After examining the briefs and record in this case, the panel unanimously holds that oral
argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a);
Rule 5A:27(a).

BACKGROUND[3]

On September 1, 2020, Ryan Lucas spoke with a man using a Facebook profile name of "George Mason" about purchasing a PlayStation 5. The two arranged for "Mason" to come to Lucas's home where Lucas would purchase the PlayStation. That morning, a vehicle with two men drove up to Lucas's home, and he went out to speak with them. The vehicle's license plate was UEP7120. The driver asked Lucas "to see the money." Lucas "pulled out the money and showed it to him, and then [the driver and passenger had a] . . . discussion in the car." The driver and Lucas then went into Lucas's home ostensibly for the driver to set up the PlayStation and receive Lucas's payment. Instead, the driver pulled out what looked like a Glock firearm and placed it on Lucas's "chest and stomach area." The driver said he would count to three and was "going to need you to give me all the money you have." Lucas gave him $300, and the driver "walked out the door" and "hustl[ed] in the car."

Lucas then told his wife, who had been sitting on the porch, what happened. Lucas called the police and gave them the license plate of the car. At 10:32 a.m. Newport News police radioed a report of a robbery and gave the license plate of the suspected car. Officer Jonathan Dawley received a report to be on the lookout for "the fleeing vehicle, of a silver four-door sedan bearing Virginia registration uniform echo papa [that] was leaving the area." In "well less than five minutes," Officer Dawley saw a car matching the description and pulled it over in a parking lot at 10:36 a.m. The passenger, Nathan Eaton, Jr., got out of the car and complied with Officer Dawley's order to get on the ground. Rogers was the driver and likewise obeyed Officer Dawley's order to

---

[3] On appeal from the denial of a motion to suppress evidence, we recite and "review[] the evidence in the light most favorable to the Commonwealth, as the prevailing party below." *Bagley v. Commonwealth*, 73 Va. App. 1, 8 n.1 (2021). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

turn off the car and throw the keys out the window. The Commonwealth presented video evidence of the traffic stop at the suppression hearing.

Newport News detectives Rousellow and Bradberry interviewed Lucas and his wife at their home at about 10:44 a.m. Lucas described the robbers as two Black males, one of whom was "tall, he's probably 6'4-6'3, probably about 210—maybe 200 pounds tall skinny, not bulky or nothing." Lucas stated that the license plate started out "UEP71" and the car was a dark grey sedan with tinted windows. Lucas confirmed he would recognize the robbers if he saw them again and had paid attention to what they looked like.

At 10:49 a.m., Detective Bradberry told Lucas that the police had two men detained and asked if he was willing to go and see if they were involved in the robbery. Detective Rousellow then discussed a show-up with Lucas and explained that the two questions for him to determine were whether he recognized anyone in the show-up and how sure he was of any identification. Detective Bradberry drove Lucas to the site of the show-up and told him that the two men would walk out separately. He also told Lucas that he should determine whether he recognized either and, if so, what did he recognize him from and how sure was he that it was the same person. Detective Bradberry and Lucas arrived for the show-up at about 11:04 a.m. At least three visible and marked police cars with their emergency lights flashing were at the show-up.

Detective Bradberry cautioned Lucas not to base any identification only on the two men's clothing but also to look at their faces. Eaton, who was handcuffed, was the first man Lucas viewed from the police car. Lucas stated that he did not "know about that first one . . . his face looks familiar. . . I can't give you a yes or no." The police then brought out Rogers, who was also handcuffed. Within seconds Lucas said: "Yes, yes. 100% positive." Detective Bradberry asked Lucas what he recognized Rogers from, and Lucas responded that Rogers was the man who had gone into his home and placed the gun on his stomach. Detective Bradberry then radioed other

- 3 -

officers that Lucas was uncertain about Eaton but was 100% certain of his identification of Rogers. Lucas then said he would like to see the car Rogers had been driving "to know for a million percent," and when they drove to it he said: "Yes. One million percent."

Rogers moved to suppress the show-up and in-court identifications of him as the robber. After conducting a suppression hearing, the circuit court denied the motion by written opinion and order. Following, Rodgers entered a conditional plea of guilty to armed robbery and use of a firearm in the commission of a felony that preserved his right to appeal the denial of the motion to suppress. This appeal follows.

ANALYSIS

"On review of the trial court's denial of a motion to suppress, an 'appellant bears the burden of establishing that reversible error occurred.'" *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 474 (2020)). In conducting our review, we are "bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence," however, we review "the trial court's application of the law *de novo*." *Malbrough v. Commonwealth*, 275 Va. 163, 168-69 (2008). In our review, we consider the evidence admitted at the suppression hearing and at trial. *Commonwealth v. White*, 293 Va. 411, 414 (2017); *Ray v. Commonwealth*, 74 Va. App. 291, 302 (2022). Here, we also consider the evidence at the preliminary hearing because the parties stipulated to making it part of the record at the suppression hearing.

A show-up is not per se unconstitutional. *Scott v. Commonwealth*, 68 Va. App. 452, 459 (2018). This is true even though, as the Supreme Court of the United States has noted, "[m]ost eyewitness identifications involve some element of suggestion." *Perry v. New Hampshire*, 565 U.S. 228, 244 (2012). To prevail in having the show-up identification declared invalid, Rogers must satisfy a two-part test. *Winston v. Commonwealth*, 268 Va. 564, 593 (2004). First, he must

show "that the circumstances of the out-of-court identification were unnecessarily suggestive." *Id.* Second, he must demonstrate that under the totality of circumstances "the identification was [not] reliable even though the confrontation procedure was suggestive." *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). If a show-up identification was not unconstitutionally suggestive, we need not address the totality of the circumstances test set forth in *Biggers*. *Scott*, 68 Va. App. at 460.

Additionally, we note that "the mechanism for determining the reliability of evidence is generally the trial itself, not a pretrial weeding out of evidence by judges." *Walker v. Commonwealth*, 302 Va. 304, 316 (2023). And what the Supreme Court of Virginia said in *Walker* about an in-court identification applies here as well: "There is no denying that an in-court identification *is* suggestive. . . . The question is whether this practice is *improperly* or *unnecessarily* suggestive within the intendment of the Due Process Clause." *Id.* at 314. *See also Perry*, 565 U.S. at 238-39 (stating that "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary").

The record supports the circuit court's holding that the show-up was not unduly suggestive. Neither Detective Rousellow nor Detective Bradberry asserted Rogers's guilt and instead emphasized that Lucas should carefully look at each man and determine *whether* he could identify either. Although Detective Bradberry told Lucas that the two men had been detained, that information told Lucas little that he surely had already surmised. *See Sample v. Commonwealth*, 303 Va. 2, 11-12 (2024) (holding that single photo show-up identification of defendant not impermissibly suggestive, as officer's comment that "I have a picture of somebody that I was thinking about" was "merely an expression of what a photographic identification unavoidably implies—that the officer believed the assailant might be pictured—not that 'this is the man who did it'"). Likewise, the fact that both men were handcuffed and that there were

several uniformed officers at the scene with their marked police cars' emergency lights flashing did not render the show-up unduly suggestive. *See Scott*, 68 Va. App. at 460 (stating that "while Scott was handcuffed and flanked by police officers during both show-up identifications, the circumstances in their entirety do not rise to the level of a constitutional violation").

The show-up procedure the officers employed here was not unduly suggestive. Moreover, to invalidate this show-up would undercut the salutary effects of a show-up this Court recognized in *Scott*. There, we stated that

> bringing a witness to view a suspect for immediate identification "fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is still fresh."

*Id.* (quoting *Martin v. Commonwealth*, 210 Va. 686, 691 (1970)). The show-up here furthered these "desirable objectives," and we hold that it was not unduly suggestive. This conclusion renders it unnecessary to determine whether under the totality of circumstances Lucas's identification of Rogers was reliable, despite any suggestiveness in the show-up. *Id.*

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*

- 6 -