COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Causey, Raphael and Senior Judge Clements


STANLEY EUGENE COLEY

MEMORANDUM OPINION*

v.      Record No. 2167-23-2                    PER CURIAM
                                                OCTOBER 14, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Randall G. Johnson, Jr., Judge

(Stephen A. Mutnick; Winslow, McCurry & MacCormac, PLLC, on
brief), for appellant.

(Jason S. Miyares, Attorney General; Mason D. Williams, Assistant
Attorney General, on brief), for appellee.


Stanley Eugene Coley appeals his convictions, following a conditional guilty plea, for

possession with intent to distribute a Schedule I/II controlled substance and possession of a

firearm by a violent felon. On appeal, Coley argues that the trial court erred when it denied his

motions to suppress the evidence. Finding no error, we affirm the convictions.[1]

BACKGROUND

"In reviewing the denial of a motion to suppress, we 'consider the facts in the light most

favorable to the Commonwealth, the prevailing party at trial.'" *Aponte v. Commonwealth*, 68

Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)).

"It is the appellant's burden to show that when viewing the evidence in such a manner, the trial

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] After examining the briefs and record in this case, the panel unanimously agrees that
oral argument is unnecessary because "the dispositive issue or issues have been authoritatively
decided, and the appellant has not argued that the case law should be overturned, extended,
modified, or reversed." Code § 17.1-403(ii)(b); Rule 5A:27(b).

court committed reversible error." *Id.* (quoting *Hairston*, 67 Va. App. at 560). "While we are bound to review *de novo* the ultimate questions of reasonable suspicion and probable cause, we 'review findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021) (alteration in original) (footnote omitted) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

On October 12, 2021, Henrico County Sergeant William Bodenhamer while in an unmarked vehicle and plain clothes was surveilling a Super 8 hotel for drug activity. During the period of surveillance, Sergeant Bodenhamer observed a black Cadillac, driven by Coley, leave the Super 8 hotel from the rear. Sergeant Bodenhamer followed Coley along Broad Street and then onto I-64. As Coley merged onto I-64, he "went from the onramp lane straight to the middle lane and then turned his blinker on when he got into the left lane and proceeded down in the left lane." Sergeant Bodenhamer noted that Coley's maneuver from the merge lane to the middle lane "affected traffic because . . . there was . . . steady traffic through that area." Sergeant Bodenhamer then paced Coley at a speed of 75 to 80 miles per hour. Sergeant Bodenhamer relayed his observations over the radio to Officer Christopher Russell who stopped the vehicle. Sergeant Bodenhamer then requested a canine unit to respond to the traffic stop, which he explained was a normal course of action during a traffic stop.

Officer Russell approached Coley's vehicle and requested his license, vehicle registration, and proof of insurance.[2] Coley produced his license and registration but not his insurance card. Officer Russell returned to his patrol vehicle and ran Coley's license and registration through his computer system.

_____

[2] Officer Russell's body-worn camera was activated during the stop and was played for the trial court.

Four minutes into the traffic stop, Officer Russell returned to the stopped vehicle for Coley's insurance card. Coley told Officer Russell that he was having difficulty accessing his insurance information on his phone. Officer Russell waited outside Coley's vehicle for five minutes while Coley looked for his insurance. When Coley did not produce proof of his insurance card, Officer Russell returned to his vehicle to finish the ten-minute traffic stop. There Officer Russell reviewed the registration replies from the DMV and VCIN, ran Coley's passenger's information for a second time, researched the proper code sections that Coley had violated, and determined his next available traffic court date. Officer Russell tried to enter the information into the E-ticket system but had to restart the program.[3]

Approximately 15 minutes into the traffic stop, Henrico County Police Officer Stephen Rowe and his canine, Colt, arrived in response to Sergeant Bodenhamer's request for a canine unit. Officer Russell, meanwhile, was still preparing the traffic ticket. Officer Rowe first approached Coley's vehicle without Colt, and explained to Coley and his passengers that he would conduct an open-air sniff[4] of the vehicle. Officer Rowe then retrieved his canine and ran the dog around the vehicle. At the time of the open-air sniff, Coley, his two passengers, and one of the passenger's pit bull were in the vehicle. When Colt alerted, Officer Rowe informed the other officers and the vehicle's occupants were removed.

A search of the vehicle produced a gray backpack in which the officers found a firearm. Coley, a felon, admitted that the gray backpack was his, and he was subsequently arrested and transported to jail. Upon arrival, officers recovered a baggie of suspected controlled substances

---

[3] The record is unclear when Officer Russell took each of these actions. At the motion to suppress, Officer Russell testified while watching his body camera footage but did not identify the timestamps relating to each of the actions he took.

[4] Officer Rowe explained that he would run Colt around the vehicle while commanding Colt to find drugs.

on Coley, which subsequently tested positive as cocaine, fentanyl, and methamphetamine in amounts inconsistent with personal use.

Before trial, Coley moved to suppress evidence obtained during the traffic stop of his vehicle. At the hearing on the motion, Officer Russell acknowledged that traffic stops average between 10 and 15 minutes. Officer Russell explained that when he returned to his patrol vehicle after talking with Coley a second time, he struggled with the E-ticket system, confirmed the correct traffic code section for the ticket, and determined his next available traffic court date. Officer Russell was aware that Officer Rowe was in route but denied intentionally prolonging the traffic stop.

Officer Rowe acknowledged that he was responding to a request to assist officers with a traffic stop. He could not remember how long it took him to arrive at the stop and noted that he simply followed his GPS to the call. He also acknowledged that it was possible that he used his lights and sirens while in route to the stop.

Coley argued that the stop was unlawful because there was no traffic infraction. Once stopped, Coley contended that Officer Russell's failure to timely issue the traffic summons unjustifiably extended the stop for Officer Rowe's arrival.

The trial court denied Coley's motion to suppress. The trial court found that Coley crossed several lanes of traffic without signaling, affecting traffic. Concerning Coley's argument that the duration of the stop was impermissibly extended, the court found that "a good portion of the time is attributed to Mr. Coley not having his insurance card." The court also ruled that any delay attributed to the Commonwealth—Officer Russell's search for the correct code section, looking up court dates, and restarting the E-ticket system—did not unreasonably extend the traffic stop.

On August 28, 2023, Coley filed a second motion to suppress the evidence obtained during the October 21, 2021 traffic stop. Coley argued that Officer Russell had no lawful authority to request him to produce proof of his vehicle insurance. Consequently, "the request and subsequent time spent searching for it impermissibly extended the traffic stop to allow the K9 to arrive." Additionally, Coley contended that the canine was not reliable and could not establish probable cause to search his vehicle.

At the hearing on Coley's second motion to suppress, the trial court found that Coley's insurance argument was a new argument on the same underlying issue, whether the officer impermissibly extended the traffic stop. The court ruled that it would not consider the issue. In the alternative, the court held that asking for Coley's insurance did not impermissibly extend the traffic stop as Officer Russell had the right to investigate the insurance issue. The trial court allowed Coley to proceed on the canine reliability issue.

Officer Rowe testified that he had been with the Henrico canine unit since 2019. In January 2021, Officer Rowe received his second canine partner, Colt, and the pair attended a 16-week narcotic detection school. Colt was trained to detect and alert to odors of cocaine, heroin, methamphetamine, and ecstasy and was certified to detect those drugs in May 2021. Between May 2021 and October 2021, Officer Rowe and Colt had conducted at least a hundred exercises and completed weekly training exercises. As of Coley's second motion to suppress hearing, Colt was still an active drug dog.

On cross-examination, Officer Rowe explained that Colt's training consisted of distraction exercises. Officers would set out food, toys, and had other dogs near things to be searched and then run their dogs around those items. When given the command to search for drugs, Colt was never distracted by food, toys, or other dogs. Although Colt was never trained

with dogs inside a vehicle, he had successfully run searches of vehicles containing dogs after training.

At the time of Coley's traffic stop, Officer Rowe would keep both dogs and people in the vehicle while running Colt. Officer Rowe's policy of leaving people and dogs inside the vehicle while running Colt has changed because Colt had become more aggressive when he detects an odor. Consequently, it is safer for all involved in the search if people and animals are first removed from the vehicle before the open-air sniff is conducted. Officer Rowe denied that the presence of people in the car would interfere with Colt's ability to smell drugs.

Concerning the pit bull involved in Coley's stop, Officer Rowe could not remember what that pit pull was doing because his focus was on Colt. Officer Rowe asserted that the pit bull did not distract Colt. Officer Rowe also admitted that there were "possibly" times when Colt alerted but no drugs were discovered. He maintained, however, that if the scent was emanating from a vehicle, "it's not even possible for [Colt] to miss it." The only reason Colt would not alert was if the scent was not able to get out of the vehicle. Officer Rowe also explained that it was possible for Colt to alert to a narcotic's "residual odor."

During re-direct examination, Officer Rowe explained that Colt behaves "totally different at home" than he does at work. At home, Colt sits and stares when Officer Rowe comes and goes and is only aroused for his Kong toy or his food bowl. When Officer Rowe is in uniform, Colt "knows that it's his job to get in [the] vehicle and then go to work." When working, Colt is focused on finding drugs.

Coley argued that Colt was unreliable. Colt was not trained for situations where another dog was in the vehicle he was directed to search, yet a dog was left in the vehicle during Colt's open-air sniff of Coley's vehicle. Additionally, Officer Rowe was aware that Colt "does not do well around people," yet Coley and his passengers were left in the vehicle during the open-air

sniff. He contended that Officer Rowe believed Colt is infallible and "ultimately this is master and dog relationship" and Colt is always looking to be rewarded when he is given the command to look for drugs.

The trial court denied Coley's second motion to suppress finding that Colt was reliable. The court noted that Officer Rowe had gone through training with Colt and that there was no indication Colt was unreliable. Although there were people and another dog in Coley's vehicle, the presence of another dog does "not ipso facto mean that Colt is unreliable." Further, Officer Rowe testified that Colt responded appropriately and as trained.

On September 28, 2023, Coley conditionally pleaded guilty to possession of drugs with intent to distribute, first offense, and possession of a firearm as a convicted felon reserving his right to appeal the trial court's denial of his motions to suppress.[5] The trial court sentenced Coley to 30 years' incarceration, with 21 years suspended. Coley appeals.

ANALYSIS

When reviewing the denial of a motion to suppress the evidence based on an alleged Fourth Amendment violation, "we defer to the trial court's 'findings of historical fact,' taking care to review them 'only for clear error and to give due weight to inferences drawn from those facts by resident judges.'" *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021) (quoting *Malbrough v. Commonwealth*, 275 Va. 163, 169 (2008)). We "presume—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the evidence in

_____

[5] Coley was originally charged with possession of a firearm while in possession of drugs with the intent to distribute; three counts of possession of drugs with intent to distribute, second offense; possession of a firearm as a convicted felon; and obstruction of justice. The Commonwealth amended Coley's possession of drugs with intent to distribute, second offense to possession of drugs with intent to distribute, first offense and nolle prosequied the remaining charges. In exchange, Coley pleaded guilty to possession of drugs with intent to distribute, first offense and possession of a firearm as a convicted felon reserving his right to appeal the trial court's denial of his motions to suppress.

favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence." *Hill v. Commonwealth*, 297 Va. 804, 808 (2019). "[T]he appellant bears the burden of showing that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error." *Scott v. Commonwealth*, 68 Va. App. 452, 458 (2018) (quoting *Sanders v. Commonwealth*, 64 Va. App. 734, 743 (2015)). But we "must determine independently whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." *Moore v. Commonwealth*, 69 Va. App. 30, 36 (2018) (quoting *Commonwealth v. Robertson*, 275 Va. 559, 563 (2008)). And we review the trial court's application of law de novo. *Bagley*, 73 Va. App. at 13.

Coley argues that the maneuver Sergeant Bodenhamer described did "not rise to a violation of either" Code §§ 46.2-804 or -848. Coley also claims that the traffic stop was unconstitutionally prolonged when Officer Russell asked for his insurance information. Finally, Coley claims that the drug detection dog in this case was generally unreliable and could not form the basis for a search of his vehicle. We will address each of these arguments in turn.

### I. The traffic stop of the vehicle was lawful.

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "A traffic stop is a '"seizure" of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment.'" *Jones v. Commonwealth*, 71 Va. App. 375, 380 (2019) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). To justify the traffic stop, an officer must have reasonable suspicion that the person stopped committed a crime or traffic violation. *McCain v. Commonwealth*, 275 Va. 546, 553 (2008).

Reasonable suspicion to justify a traffic stop "must be based upon specific and articulable facts." *Mason v. Commonwealth*, 291 Va. 362, 368 (2016). "'Reasonable suspicion' is more

than a 'mere hunch' but less than 'proof of wrongdoing by a preponderance of the evidence.'" *Commonwealth v. Thomas*, 23 Va. App. 598, 610-11 (1996). The "mere 'possibility of an innocent explanation' does not necessarily exclude a reasonable suspicion that the suspect might be violating the law." *Shifflett v. Commonwealth*, 58 Va. App. 732, 736 (2011).

Code § 46.2-804(2) provides that "[a] vehicle shall be driven as nearly as is practicable entirely within a single lane and shall not be moved from that lane until the driver has ascertained that such movement can be made safely." Code § 46.2-848 requires that

> [e]very driver who intends to back, stop, turn, or partly turn from a direct line shall first see that such movement can be made safely and, whenever the operation of any other vehicle may be affected by such movement, shall give the signals required in this article, plainly visible to the driver of such other vehicle, of his intention to make such movement.

Sergeant Bodenhamer followed Coley as he merged onto I-64. Coley moved from the merge lane to the middle lane without first establishing himself in the right lane of I-64 and without signaling. Sergeant Bodenhamer attested that the maneuver occurred in steady traffic at about 1:00 p.m. and that Coley's maneuver affected other vehicles traveling along I-64. Sergeant Bodenhamer radioed his observation to Officer Russell, who initiated the traffic stop. Given these facts, Officer Russell had reasonable suspicion to believe that Coley had violated either Code § 46.2-804(2), when he moved from a lane before he ascertained if that maneuver was safe to do so, or Code § 46.2-848, when he failed to signal to other drivers who may be affected by his lane change. Accordingly, the trial court did not err in finding that the traffic stop was lawful.

## II. The stop was not impermissibly extended.

As the United States Supreme Court explained in *Rodriguez v. United States*, 575 U.S. 348, 350 (2015), "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." "A seizure

justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 350-51 (alterations in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop"—such as a dog sniff—but he "may not do so in a way that prolongs the stop" if he does not also have "the reasonable suspicion" of other criminal activity "ordinarily demanded to justify detaining an individual." *Id.* at 355. The seizure of the traffic stop "remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id.* (alteration in original) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). *Rodriguez* rejected the idea that prolonging a stop without reasonable suspicion can be de minimis. *Id.* at 356-57.

Tasks that fall within the lawful scope of a traffic stop include those related to securing officer safety, maintaining the safety of the highways, checking the driver's license, inspecting the vehicle's registration and proof of insurance, and determining whether the driver has outstanding warrants. *Id.* at 355-56. Tasks that exceed the mission of the stop include questioning the motorist about his criminal history and waiting for the arrival of "a K-9 unit to conduct a dog sniff." *Matthews v. Commonwealth*, 65 Va. App. 334, 345 (2015).

Whether a stop has been prolonged by an officer is heavily fact-dependent, turning on whether such action "adds time to[] the stop." *Rodriguez*, 575 U.S. at 357 (internal quotation marks omitted). In reviewing the facts, appellate courts give great deference to the trial court's findings. *E.g.*, *Bagley*, 73 Va. App. at 13.

When Officer Russell stopped Coley's vehicle he asked for Coley's license, vehicle registration, and proof of insurance. Coley produced his license and registration but was unable

to immediately produce proof of his insurance. Officer Russell returned to his patrol vehicle and ran a check of Coley's license and registration.

Four minutes into the traffic stop, Officer Russell returned to Coley's vehicle and inquired if Coley had found his insurance. Coley indicated that his insurance was on his phone but that he was having difficulty pulling up the insurance information. Officer Russell confirmed that he understood and spent five minutes at Coley's window waiting for Coley to provide his insurance information.

Ten minutes into the traffic stop, Officer Russell returned to his patrol vehicle and reviewed the results he had requested from his computer system and began Coley's E-ticket. Officer Russell admitted he struggled with the E-ticket system and had to restart the program. He was still preparing the E-ticket when Officer Rowe arrived 15 minutes into the traffic stop and proceeded to conduct the open-air sniff of Coley's vehicle with Colt, taking two minutes.

Considering the circumstances in the light most favorable to the Commonwealth, Officer Russell's request for Coley's insurance information did not improperly extend the length of the traffic stop, and the trial court did not err in denying Coley's motion to suppress on this basis.

III. The evidence proved that the drug-sniffing dog was reliable.

The Virginia Supreme Court has held that "a positive alert from a narcotics detection dog establishes probable cause to conduct a search of a vehicle and that evidence seized during the search is admissible after a proper foundation has been laid to show that the dog was sufficiently trained to be reliable in detecting narcotics." *Jones v. Commonwealth*, 277 Va. 171, 180 (2009). A "dog's reliability can be established from its training and experience, as well as a proven track record of previous alerts to the existence of illegal narcotics." *Id.* at 180-81. "Specific certifications and the results of field testing are not required to establish a sufficient foundation." *Id.* at 181. "[I]f the dog's qualifications are challenged, [however,] the trial court may consider

any relevant evidence in determining whether the Commonwealth has established the dog's reliability in detecting narcotics." *Id.*

Coley argues that the Commonwealth's evidence failed to establish Colt's reliability. He noted that Colt only received weeks of training, only passed two or three tests to gain his certification, and was taught to please his handler. Colt was not trained for situations where another dog was in the vehicle. Additionally, Officer Rowe was aware Colt "did not run people well," yet Coley and his passengers were left in the vehicle during the open-air sniff. Moreover, Officer Rowe seemed to believe that Colt was infallible.

The trial court did not err in holding that Colt was reliable. Officer Rowe testified at length regarding his and Colt's qualifications. Officer Rowe testified that he had been a canine handler since 2019 and that Colt was his second canine partner. Officer Rowe and Colt received specialty training at a 14-to-16-week program. Training included familiarization with Colt's alerts. Colt was certified to detect odors of cocaine, heroin, methamphetamine, and ecstasy in May 2021. Between May 2021 and October 2021, Officer Rowe and Colt had conducted at least a hundred exercises and completed weekly training exercises. Since the October 2021 traffic stop, Colt had been recertified.

Considering the evidence of the narcotics detection dog's training, experience, and reliability in the light most favorable to the Commonwealth, the trial court did not err in rejecting Coley's claim that Colt was unreliable and in denying Coley's motion to suppress.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*